UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------X

THOMAS SABELLA and KAREN SABELLA,     **AFFIDAVIT IN SUPPORT**

            Plaintiffs,

     -against-             Civil Action Docket
                        No. 3:02 CV 2008 (SRU)

NORTHEAST GENERATION SERVICES
COMPANY and NORTHEAST UTILITIES,

            Defendants.

------------------------------------X

UNITED STATES DISTRICT COURT  )
                      )ss.
DISTRICT OF CONNECTICUT     )

I, Thomas Sabella being duly sworn, depose and state:

### Factual Background

1.   My wife, Karen Sabella and I, (hereinafter referred to collectively as the "Plaintiffs" or "Sabellas"), are the plaintiffs in the above-captioned action, and I submit this Affidavit in support of the Plaintiffs' Motion for Partial Summary Judgment.

2.   I am an individual who is a citizen of the State of New Jersey and reside at 9 Wren Court, Middletown, New Jersey.  I am also an attorney having been admitted to practice law in New York State, a real estate investor, and the Executive Vice President of the Hertz Corporation responsible for all of the corporation's real estate in North America.

1

3.   On or about September 29, 2000, my wife and I purchased real property from Har-Flan Associates of Rocky Hill (hereinafter referred to as "Har-Flan"), located at 273 Dividend Road, Rocky Hill, Connecticut (hereinafter referred to as "the Premises").  A copy of the warranty deed from Har-Flan to Thomas and Karen Sabella is annexed to Plaintiffs' Local Rule 56 (a)1 Statement dated December __, 2003 (hereinafter referred to as the "Rule 56 (a)1 Statement"), and marked thereto as Exhibit A.

4.   My wife and I are co-owners of the premises and are united in interest.

5.   The premises consist of a commercial building located in an industrial warehouse park and were designed to be used predominantly as warehouse space with some related offices.

6.   The defendant, Northeast Generation Services (hereinafter referred to as "NG"), was a tenant in the premises pursuant to a written lease agreement with Har-Flan, dated May 13, 1999 (hereinafter referred to as the "Lease").  A copy of the lease is annexed to the Rule 56 (a)1 Statement, and marked thereto as Exhibit D.

7.   Upon information and belief, NG is engaged in the business of servicing and maintaining electrical power plants.

8.   On or about June 11, 1999, the defendant, Northeast Utilities (hereinafter referred to as "NU"), executed a Performance Guaranty, whereby, NU irrevocably and unconditionally guaranteed

2

the full and prompt performance of NG's obligations under the Lease. A copy of the performance guaranty is annexed to the Rule 56 (a)1 Statement, and marked thereto as Exhibit E.

9. On September 29, 2000, Har-Flan assigned to the Sabella's, all of its right, title and interest in the Lease and the Performance Guaranty. A copy of the Assignment Agreement dated September 29, 2000, is annexed to the Rule 56 (a)1 Statement, and marked thereto as Exhibit F.

## First Claim For Relief
## (Breach of Contract by NG)

10. The plain and unambiguous language of paragraph twelve (12) of the lease, provides, in pertinent part, as follows:

> "The Landlord shall deliver the Leased Premises in "As Is" condition. The Tenant shall be responsible to complete any improvements at their own expense. Prior to the start of any new construction, the Tenant shall provide a scope of work to the Landlord and name(s) of contractors for approval, which shall not be unreasonably withheld. All work must comply with state and local building codes and be inspected and approved by local officials. At the end of the lease term the Tenant agrees to restore the premises to original condition, if requested by Landlord…" A copy of the lease is annexed to the Rule 56 (a)1 Statement, and marked thereto as Exhibit D.

11. As set forth in the Rule 56(a)1 Statement at ¶¶¶ 10, 11, 12, NG made significant alterations to the premises during its occupancy. In fact, William J. Nadeau, a Vice President at NG, has admitted that NG made alterations to the premises which included

3

the following: removal of the mezzanine; construction of partition areas in the warehouse space of the premises; construction of interior walls; construction of a lunchroom; removal of restroom facilities; installation of air conditioning units placed in exterior walls; the consolidation of electric meters; changes to the telecommunications systems; and the installation of a ramp in the middle of the premises. *See* Rule 56(a)1 Statement at ¶12. As I am in possession of the premises, I can confirm that NG made various changes, alterations and modifications to the premises which customized the premises for their unique and exclusive needs, namely, the service and maintenance of electrical power plants.

12.  On or about September 25, 2001, NG provided me with written notice of its intent to terminate the lease effective July 31, 2002.  A copy of the Notice of Termination is annexed to the Rule 56 (a)1 Statement, and marked thereto as Exhibit M.

13.  Prior to the termination of the lease term and pursuant to paragraph twelve (12) of the lease, I made several written requests to NG that it restore portions of the premises to the original condition in which it existed prior to NG's occupancy.  My requests to NG included the following: (i) restoration of approximately 1,700 square feet of finished office space on the Mezzanine level which was available for rent and removed by NG; (ii) restoration of three separate working electric meters; (iii) removal of interior walls and other conditions (including office

4

cubicles in the middle of the warehouse) constructed by NG in order

to restore the premises to open and finished warehouse space; (iv)

restoration of walls and doors which divided the premises into

three separate units which were available for rent; (v) restoration

of male and female restroom facilities which were removed from the

premises; (vi) removal of a large concrete ramp in the middle of

the premises; (vii) removal of air conditioning units installed in

the exterior walls of the premises and restoration of those walls;

and (viii) restoration of original telecommunications equipment as

well as other building systems and meters for multi-tenant

occupancy of the premises.  Copies of letters from Thomas Sabella

to William Nadeau dated October 10, 2001, November 23, 2001, and

July 31, 2002; and to James P. Donohue, Manager of Administrative

Services at NG, dated June 12, 2002, regarding notice to restore

portions of the premises to the original condition are annexed to

the Rule 56 (a)1 Statement, and marked thereto as Exhibit N.  In

addition, I followed up with telephone calls to James Donohue, and

an attorney in the law department at NG, concerning my written

requests that NG restore portions of the premises.  Excerpts from

my deposition taken on June 27, 2003, regarding my attempts to

contact personnel at NG by telephone at pp. 86-91, are annexed to

the Rule 56 (a)1 Statement, and marked thereto as Exhibit O.

   14.  Despite my repeated requests and demands, NG refused to

comply with paragraph twelve (12) of the lease and restore portions

of the premises to the original condition. Moreover, NG, has
admitted in its responses to Plaintiffs' First Set of
Interrogatories, that it has not done anything to restore the
premises to the original condition. *See* Rule 56 (a)1 Statement at
¶18, indicating the defendants' admission that no efforts were made
by the defendants to restore the premises.

15.  On July 31, 2002, NG vacated the premises and failed to
restore portions of the premises to the original condition as
required by paragraph twelve (12) of the lease.

16.  As a result of NG's failure to restore portions of the
premises to the original condition, the plaintiffs' have incurred
damages as they relate to: (1) the cost of restoration of portions
of the premises to the original condition prior to NG's occupancy;
(2) lost rent for the premises due to the inability to re-rent the
premises to new tenants; and (3) attorneys' and expert witness
fees.

17.  As a result of NG's failure to restore portions of the
premises to the original condition, the plaintiffs must now incur
substantial costs and expenses, including but not limited to: (i)
restoring approximately 1,700 square feet of finished office space
on the Mezzanine level which was removed by NG; (ii) restoring
three separate working electric meters; (iii) demolishing interior
walls and other conditions constructed by NG in order to restore
the premises to open and finished warehouse space (including

6

removal of office cubicles in the middle of the warehouse); (iv) restoring walls and doors which divided the premises into three separate units; (v) restoring male and female restroom facilities; (vi) removing a large concrete ramp in the middle of the premises; (vii) removing air conditioning units in the exterior walls and restoring those walls; and (viii) restoring original telecommunications equipment as well as other building systems and meters for multi-tenant occupancy of the premises.

18.    On March 3, 2003, I received an estimate from Gary R. Dayharsh, President of Delta Building Corporation, and a competent contractor in the Rocky Hill, Connecticut area regarding the cost to restore portions of the premises to their original condition prior to NG's occupancy.  Mr. Dayharsh advised me that the total cost to restore the premises was $283,730.00[1].  A copy of the estimate I received from Mr. Dayharsh is annexed hereto and marked as Exhibit A.

19.    The proper theory of damages in this case is the cost to restore the premises to the original condition prior to NG's occupancy because paragraph (12) of the Lease expressly requires that NG restore the premises at the end of the lease term if requested by the landlord.  Moreover, NG's customized alterations

---

[1]    Plaintiffs submit this figure merely to show the existence of damages as a result of NG's breach of the lease, and respectfully request that a separate hearing be held by the Court at a later date, in order to determine the actual amount of plaintiffs' damages in this action.

so modified the premises that few, if any, prospective tenants could now utilize the space within the premises. Accordingly, the only proper damages in this case is the cost of restoration of the premises to the original condition prior to NG's occupancy.

20. In addition, as a result of NG's failure to restore portions of the premises to the original condition, the plaintiffs have had extreme difficulty in re-renting the premises to new tenants primarily because NG's alterations customized the premises for its very unique and specific needs, namely the service and maintenance of electrical power plants. For instance, NG's construction of office cubicles and other modifications in the middle of the warehouse, has caused a reduction in the total available open warehouse space and were placed in locations which make it difficult to use the remaining warehouse space effectively. As a result, this has made it difficult to rent the premises to new tenants who are primarily interested in renting open warehouse space. *See also* deposition testimony of Jay L. Morris regarding the difficulty of re-renting the premises to new tenants as a result of NG's changes to the combination of office space and warehouse space within the premises at p. 143, annexed to the Rule 56 (a)1 Statement and marked thereto as Exhibit R. In addition, the premises lost approximately 1,700 square feet of rentable office space due to NG's removal of the mezzanine level. As a result, plaintiffs can no longer rent out this square footage to

new tenants which existed prior to NG's removal of the mezzanine. Finally, I had to replace the male and female bathrooms removed by NG as it is against the law to rent an office suite without restroom facilities. Only recently, as of July 1, 2003, were plaintiffs able to rent approximately 1/4 of the premises to a new tenant, with significant restoration costs incurred by the Plaintiffs. Excerpts from my deposition testimony regarding the difficulty of re-renting the premises at pp. 52-53, are annexed to the Rule 56 (a)1 Statement, and marked thereto as Exhibit Q.

20. As a result of NG's failure to restore portions of the premises to the original condition, the plaintiffs have incurred damages in the form of lost rent due to the inability to rent out the entire premises to new tenants. As of November 31, 2003, plaintiffs' damages due to lost rent for the premises, are $295,000.00.[2] This figure combines the amount of lost rent for the period of August 1, 2002 through June 30, 2003 which is $220,000.00,[3] with the amount of lost rent for the months of July 2003 through November 31, 2003, which is $75,000.00.[4] The lost

---

[2]  Plaintiffs submit this figure merely to show the existence of damages as a result of plaintiffs' inability to rent out the premises to new tenants because of NG's customized alterations thereto.

[3]  During NG's tenancy, the rent for the premises was approximately $20,000 per month.

[4]  As of July 1, 2003, plaintiffs were able to rent out only 1/4 of the premises to a new tenant and have received approximately $25,000.00 for rent and expenses to date, and accordingly have

9

rent for the premises will continue to accrue monthly.

21.    Plaintiffs' have incurred attorneys' and expert fees in connection with the instant action.

22.    Accordingly, the Plaintiffs' motion for partial summary judgment on liability should be granted since the Plaintiffs have unequivocally established the following: (1) Paragraph (12) of the Lease required NG to restore the premises to the original condition; (2) NG acknowledges that it made the subject alterations to the premises; (3) the Plaintiffs gave repeated and timely notice to NG that it restore the premises; (4) NG has admitted that it has made no efforts to restore the premises; and (5) the Plaintiffs have incurred damages as a result of NG's breach of the Lease.

## Second Claim For Relief
### (Breach of Performance Guaranty by NU)

23.    The terms of the Performance Guaranty, executed by NU indicate that NU irrevocably and unconditionally guaranteed to Har-Flan, its successors and assigns, *inter alia*, full and prompt performance of NG's obligations under the Lease.  *See* Rule 56 (a)1 Statement at ¶5, and Exhibit E annexed thereto.

24.    Pursuant to the terms of the Performance Guaranty, NU, irrevocably, unconditionally, and expressly waived notice with respect to any of the Guaranteed Obligations under the Lease and any requirement that the Sabellas first proceed against NG with

---

deducted this amount from the lost rent for the premises for the months of August 2003 through November 2003.

respect to their claims. *See* Exhibit E annexed to the Rule 56 (a)1 Statement.

25. NU has also admitted in its responses to Plaintiff's First Set of Interrogatories, that it has not done anything to restore the premises to the original condition as required under paragraph (12) of the Lease. *See* Rule 56 (a)1 Statement at ¶18, indicating the defendants' admission that no efforts were made by the defendants to restore the premises.

26. As a result of NU's breach of its Performance Guaranty, the Plaintiffs have incurred damages as set forth above in my Affidavit including: (i) the cost of restoration of portions of the premises to the original condition prior to NG's occupancy; (2) lost rent for the premises due to the inability to re-rent the premises to new tenants; and (3) attorneys' and expert witness fees.

27. Accordingly, the Plaintiffs' motion for partial summary judgment on liability should be granted since the Plaintiffs have unequivocally established the following: (1) NU executed a Performance Guaranty which irrevocably and unconditionally guaranteed full and prompt performance of NG's obligations under the Lease; (2) NU irrevocably, unconditionally, and expressly waived notice with respect to any of the Guaranteed Obligations under the Lease; (3) NU has admitted that it has made no efforts to restore the premises to the original condition; and (4) the

11

Plaintiffs have incurred damages as a result of NU's breach of the Performance Guaranty.

28.    The Plaintiffs respectfully request that a separate hearing be held by the Court in order to determine the actual amount of Plaintiffs' damages in this action.

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiffs' Notice of Motion and Affidavit in Support For Partial Summary Judgment have been served upon the following counsel of record by first class mail, postage prepaid this 10th day of December, 2003.

To:  Ann H. Rubin, Esq.
      Carmody & Torrance LLP
      195 Church Street, 18th Floor
      P.O. Box 1950
      New Haven, Connecticut 06509-1950


      Duncan R. MacKay, Esq.
      Northeast Utilities Service Company
      P.O. Box 270
      Hartford, Connecticut 06141-0270


_____
Harry J. Nicolay, Jr. (CT24875)



March 3, 2003

Mr. Thomas A. Sabella
Via Fax (201) 307-2689

RE:    273 DIVIDEND ROAD
         ROCKY HILL, CT

Dear Mr. Sabella:

As requested, I have completed an estimate to complete the work to restore portions of
the building to their original condition prior to occupancy by Northeast Utilities. The
work is as outlined on Schedule "A", and per the sketch entitled 273 Dividend Road,
which you provided to me and is attached hereto for reference.

As we also discussed, I was personally responsible for the construction of both the initial
unit (1) as well as the addition including Units 2 and 3 several years thereafter for the
previous owner, Har-Flan (a.k.a. Abacus Business Products). Furthermore, I had toured
the building immediately prior to the start of the work by Northeast upon a request of
Peter Harding of Har-Flan.

This being the case, I feel that these costs accurately reflect the value of the work to
restore the building to its original condition prior to the construction of the tenant
improvements by Northeast.

My estimate is based upon all work being completed at one time, in it's entirety. The
work would be completed within eight (8) weeks of issuance of a permit from the Town
of Rocky Hill and your notice to proceed.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Gary R. Dayharsh
President

GRD:ilg
Enc.



## ESTIMATE

| | |
|---|---|
| General Conditions (2 months)<br>Supervision and project management<br>Plans, permits, fees, trash removal,<br>Insurance, etc. | $20,800 |
| 1.  Restore 1700 sq. ft. offices<br>   Code compliant stairwell | $68,000<br>$15,400 |
| 2.  Restore (3) separate working electric<br>   meters. | $4,800 |
| 3.  Demolish approx 6700 sq. ft. of interior<br>   walls, ceilings, etc. and restore to finished<br>   warehouse space including restoration<br>   of concrete floors | $77,000 |
| 4.  Restore demising walls | $2,800 |
| 5.  Restore restrooms at Unit 3 | $17,000 |
| 6.  Remove ramp and repair slab | $12,800 |
| 7.  Remove through wall a/c units and repair walls | $875 |
| 8.  N/A | $0 |
| 9.  Restore gas metering for 3 tenant occupancy<br>   Note: Water metering will remain as a single<br>   meter system as was the original design | $1,740 |
| 10.  All work will meet current codes | _____ |
| Sub-total | $221,215 |
| Contractors OH&P | 46,455 |
| Sales Tax on Renovations | 16,060 |
| TOTAL | $283,730 |



March 3, 2003

Mr. Thomas A. Sabella
Via Fax (201) 307-2689

RE:  273 DIVIDEND ROAD
      ROCKY HILL, CT.

## INVOICE

For field measurements and inspections of existing conditions and preparation
of estimated dated February 29, 2003 per agreement of February 18, 2003.

**AMOUNT NOW DUE**                              $1,900.00

THANK YOU!

**WHEREFORE**, it is respectfully requested that the instant motion be granted in its entirety, together with such other, further and different relief as this Court deems just and proper in the circumstances and the costs, disbursements, interest and attorneys fees of this action.

_____
THOMAS SABELLA

Subscribed and sworn to before
me on December /th, 2003

_____
Notary Public
MARIE PANDOLFO
Notary Public of New Jersey
My Commission Expires Feb. 3, 2005

10