# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THOMAS SABELLA and KAREN SABELLA,    :    CIVIL ACTION NO.
    :    3:02 CV2008 (SRU)

        Plaintiffs,    :

    :

VS.    :

    :

    :

NORTHEAST GENERATION SERVICES    :
COMPANY and NORTHEAST UTILITIES,    :    DECEMBER 29, 2003

Defendants.    :

**MEMORANDUM OF LAW OF NORTHEAST GENERATION SERVICES COMPANY
AND NORTHEAST UTILITIES IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**

ANN H. RUBIN (ct04486)
Carmody & Torrance LLP
195 Church Street; 18th Floor
P.O. Box 1950
New Haven, CT 06509-1950
Phone: 203-777-5501
Facsimile: 203-784-3199
**Email: arubin@carmodylaw.com**

Attorney for the Defendants,
Northeast Generation Services Company
and Northeast Utilities

{W1281397}

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................... 2

III. SUMMARY JUDGMENT STANDARD ............................................................. 7

IV.  ARGUMENT........................................................................................................ 8

    A.    Proof Of Damage Is An Essential Element Of A Breach Of Contract Cause Of Action............................................................................................................... 8

        1.    Under Connecticut Law, The Proper Measure Of Damages Is The Diminution In The Value Of The Premises Caused By The Defendants' Failure To Restore The Premises To Their Original Condition ................. 9

        2.    Courts In The Fourth, Seventh, Ninth, and Federal Circuits Also Use Diminution In Market Value As The Damage Measure Where The Cost Of Restoration Exceeds The Diminution In Market Value Attributable To The Lessee's Non-Performance ................................................................. 12

        3.    The Cases Upon Which The Plaintiffs Rely Are Factually Distinct From The Present Case..................................................................................... 18

    B.    Because The Plaintiffs Have Not Been Damaged As A Matter Of Law, They Are Not Entitled To Any Recovery .......................................................................... 19

        1.    Defendants' Appraisal Indisputably Demonstrates That The Value Of The Premises With NGS's Improvements Is Greater Than The Value Of The Premises Returned To Their Original Condition...................................... 20

        2.    The Plaintiffs Have Presented No Evidence That The Defendants' Failure To Restore The Premises Caused Them To Lose Rental Income ........... 24

        3.    The Plaintiffs Are Not Entitled To Recover Attorneys' Fees And Other Costs Associated With This Lawsuit ....................................................... 25

V.   CONCLUSION..................................................................................................... 25

## TABLE OF AUTHORITIES

### Federal Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)..................................................................................................7, 8

Associated Stations v. Cedars Realty and Dev., 454 F.2d 184 (4th Cir. 1972)..........12, 14, 15, 23

Banisadr Bldg. Joint Venture v. United States, 38 Fed. Cl. 392 (Ct. Cl. 1997)............13, 16, 23

Bowes v. Saks & Company, 397 F.2d 113, 116 (7th Cir. 1968).....................12, 13, 14, 15, 23

Chelates Corp. v. Citrate, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)...................8

Dodge Street Building Corp. v. United States, 341 F.2d 641 (Ct. Cl. 1965)......12, 14, 15, 16, 23

Maloney v. Connecticut Orthopedics, P.C., 47 F. Sup.2d 244 (D. Conn. 1999).....................9

Missouri Baptist Hospital v. United States, 555 F.2d 290 (Ct. Cl. 1977)..............10, 13, 16, 23

Pennsylvania Cement Co. v. Bradley Contracting Co., 11 F.2d 687 (2d Cir. 1926)...........12, 14

San Nicolas v. United States, 617 F.2d 246 (Ct. Cl. 1980)...........................................16

United States v. Flood Building, 157 F.Supp. 438 (N.D. Cal. 1957)............................12, 17

### State Cases

Blakeman v. Tobin, 177 Conn. 597, 419 A.2d 336 (1979).............................................9

Bouchard v. Sundberg, 80 Conn. App. 180 (2003)....................................................9

Falco v. James Peter Associates, Inc., 165 Conn. 442, 334 A.2d 475 (1973).................10, 18

Ferri v. Pyramid Construction Co., 186 Conn. 682, 443 A.2d 478 (1982).........................10

Johnson v. Healy, 176 Conn. 97, 405 A.2d 54 (1978)...............................................9

Levesque v. D & M Builders, Inc., 170 Conn. 177, 365 A.2d 1216 (1976).........................9

Loda v. H.H. Sargeant & Associates, Inc., 188 Conn. 69, 448 A.2d 812 (1982)....................9

Spera v. Audiotape Corp., 1 Conn. App. 629, 474 A.2d 481 (1984).......... 9, 10, 11, 12, 18, 23

Richard v. A. Waldman & Sons, Inc., 155 Conn. 343, 232 A.2d 307 (1967)..................9, 10

**Secondary Sources**

William H. Danne, Jr., Measure and Elements of Damages for Lessee's Breach of Covenant as to Repairs, 45 A.L.R. 5th 251, Section 2a (1997)......................…....13

Milton R. Friedman, Friedman on Leases, § 18.1, p. 1209 (4th Ed. 1997)....................12, 13

49 Am. Jur.2d Landlord & Tenant, Section 888 (1995)...............................................13

**Statutes and Regulations**

Fed. R. Civ. P. 56.......................................................................................................7

# I.    INTRODUCTION

The defendants, Northeast Generation Services Company ("NGS") and Northeast Utilities ("NU"), submit this memorandum of law in opposition to the motion for partial summary judgment filed by the plaintiffs, Thomas Sabella and Karen Sabella (collectively, the "Sabellas"), and in support of the cross motion for summary judgment that the defendants are filing herewith.   NGS and NU seek an order denying the plaintiffs' motion for partial summary judgment on both causes of action alleged in their Complaint, and granting the cross-motion for summary judgment of NGS and NU.   Summary judgment in favor of the defendants is appropriate in this case because no triable issues of fact exist that would preclude entry of summary judgment in favor of the defendants and the defendants are entitled to judgment as a matter of law.

The only disputed issue in this case is a legal question regarding the appropriate measure of damages where, as here, the undisputed facts show that the plaintiffs have suffered no damage as a result of NGS's failure to restore the premises it leased from plaintiffs to their original condition.   Importantly, the defendants have introduced an appraisal of the property that is the subject of this matter that demonstrates that the market value of the plaintiffs' property is greater as a result of the improvements that NGS made than it would be if restored to its original condition.   Accordingly, the plaintiffs are already in a better position than they would have been in had the building been restored to its original condition.   The Court, therefore, should conclude as a matter of law that the plaintiffs have not suffered any damage and that awarding them any recovery would be a windfall.

## II.    STATEMENT OF FACTS

NGS and Har-Flan Associates ("Har-Flan") entered into a written lease agreement, dated May 13, 1999 (the "Lease").  See Complaint at ¶6; Answer at ¶6 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibits B and C, respectively).  Under the Lease, NGS rented from Har-Flan space in a 29,700 square foot commercial building located at 273 Dividend Road, Rocky Hill, Connecticut (the "Premises") for a term of sixty-two months commencing on June 1, 1999 and ending on July 31, 2004. See Lease at ¶¶1-2 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A).  On or about June 1, 1999, NGS entered into possession of the Premises and initially rented 24,500 square feet of the Premises.  See Complaint at ¶15; Answer at ¶15; and Lease at ¶1 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibits B, C, and A, respectively).  Paragraph 38 of the Lease states that the Lease "shall be construed under the laws of the State of Connecticut."  See Lease at ¶38 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A).

On or about June 11, 1999, defendant NU executed a performance guaranty of NU's obligations under the Lease.  See Complaint at ¶13; Answer at ¶13 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibits B and C, respectively).  A copy of the Performance Guaranty is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit D.

Paragraph 12 of the Lease permitted NGS to make alternations to the Premises with the approval of the landlord.  See Lease at ¶12 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A).  Paragraph 12 of the Lease also contained a restoration clause.  Id. During its tenancy, NGS, with the permission of the landlord, made numerous improvements to the Premises. See Deposition of William J. Nadeau, Vice President and Chief Operating Officer of NGS, at pp. 53, 87 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit E).

Under the Lease, NGS had a right of first refusal to rent approximately 5,207 square feet of additional space that was adjacent to the Premises. See Lease at ¶30 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A). On or about October 19, 1999, pursuant to its right of first refusal set forth in the Lease, NGS exercised its right to lease the remaining 5,207 square feet of the Premises. See Complaint at ¶18; Answer at ¶18 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibits B and C, respectively). A copy of the agreement governing NGS's lease of the additional 5,207 square feet is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit G.

By a warranty deed, dated September 29, 2000, Har-Flan sold the Premises to the plaintiffs Thomas Sabella and Karen Sabella (collectively, the "Sabellas"). (A copy of the warranty deed is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit H). On September 29, 2000, Har-Flan also assigned the Lease and the Performance Guaranty to the plaintiffs. (A copy of the Assignment is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit I).

Many of NGS's changes to the Premises were designed to make the facility compliant with relevant municipal codes and other legal requirements regarding handicapped accessibility. For example, the ramp that NGS installed was legally required in order to give disabled employees access to the facility, and NGS's changes to the Premises' bathroom facilities included installing handicapped accessible restroom facilities, which the Premises had previously lacked. In addition, NGS's changes to the Premises' electrical, telecommunications, and air conditioning systems were upgrades to those systems. See Deposition of Mr. William Nadeau, Vice President and Chief Operating Officer of NGS at 53, 87 (attached to the defendants' Local

Rule 56(a)1 Statement as Exhibit E). See also Affidavit of James Donohue, Services Manager of NGS, at ¶¶5-6 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit F).

NGS removed stairway access to a mezzanine existing on the Premises in order to bring the mezzanine into compliance with applicable building codes and other legal requirements. See Affidavit of James Donohue at ¶5 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit F). All work on the mezzanine was completed by June 30, 1999, and after NGS rebuilt the mezzanine floor space, it had approximately the same number of square feet as it had previously. Id. at ¶6. Stairway access to the mezzanine level had, thus, been removed prior to the plaintiffs' purchase of the Premises on September 29, 2000.

Pursuant to paragraph 13 of the Lease, NGS had the right to terminate the Lease at the end of thirty-eight (38) months provided it complied with certain conditions for early termination of the lease. See Lease at ¶13 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A). On or about September 25, 2001, NGS gave the plaintiffs written notice of its intent to terminate the Lease effective July 31, 2002. See Complaint at ¶22; Answer at ¶22 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibits B and C, respectively). A copy of NGS's Notice of Termination is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit J. Pursuant to paragraph 13 of the Lease, NGS made, and the plaintiffs accepted, the requisite early termination payment to the plaintiffs by remitting a check in the amount of thirty-four thousand four hundred dollars ($34,400.00), an amount that represented the unamortized landlord allowance toward tenant improvements. See Lease at ¶13 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A). A copy of a letter, dated October 10, 2001, from Thomas Sabella to William Nadeau in response to the Termination Notice is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit K.

As of June 1, 1999 (i.e., the first date of the Lease), the market lease rate for the Premises in their original condition (i.e., without NGS's improvements) was $6.50 per square foot for a rentable area of 29,700 square feet. This translates to an annual market rent of $193,050.00 See Appraisal by Arnold J. Grant Associates, Inc. ("Grant") at 30. A copy of the Grant Appraisal is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit L.

As of June 1, 1999 (i.e., the first date of the Lease), the market lease rate for the Premises in their improved condition (i.e., with NGS's improvements) was $7.50 per square foot for a rentable area of 28,200 square feet. This translates to an annual market rent of $211,500.00, or $18,450.00 more than the annual market rent for the Premises in their original condition as of the same date. See Grant Appraisal at 30.

As of June 3, 2002 (i.e., the date of Grant's inspection of the interior of the Premises, and approximately 60 days before the Lease was terminated), the market lease rate for the Premises if restored to their original condition (i.e., before NGS's improvements) would have been $7.00 per square foot for 29,700 square feet of rentable space. This translates to an annual market rate of $207,900.00 for the Premises in their original condition. See Grant Appraisal at 31.

As of June 3, 2002 (i.e., the date of Grant's inspection of the interior of the Premises), the market lease rate for the Premises in their improved condition (i.e., with NGS's improvements) would have been $8.00 per square foot for 28,200 square feet of rentable space. This translates to an annual market rate of $225,600.00, or $17,700.00 more than the market rent for the Premises in their original condition as of the same date. See Grant Appraisal at 31.

The plaintiffs do not wish to restore the Premises to their original condition; instead, they seek to restore only "portions" of the Premises to their original condition in order to retain the benefit of NGS's improvements to the property. At the same time, the plaintiffs seek to recover

the full cost of restoring the Premises to their original condition.  See Affidavit of Thomas

Sabella, ¶¶13-20 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit M);

Deposition of Thomas Sabella at 32 (attached to the defendants' Local Rule 56(a)1 Statement as

Exhibit N).

      The plaintiffs have yet to undertake virtually all of the restoration work that they claim

NGS and NU are required to fund.  As of Thomas Sabella's deposition on June 27, 2003, among

other things, the plaintiffs had not restored the three separate electric meters, had not demolished

the interior walls that NGS erected, had not removed the large concrete wheelchair ramp, and

had not restored the Premises' original telecommunications equipment.  Deposition of Thomas

Sabella at 105-06 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit N);

Deposition of Jay L. Morris at 194 (excerpts from the deposition testimony of Jay L. Morris are

attached to the defendants' Local Rule 56(a)1 Statement as Exhibit O).

      There is no admissible evidence in the record before the Court that the improvements

made to the Premises caused the plaintiffs any loss of rental income.   The only "evidence" that

the plaintiffs have presented is the testimony of their broker, Mr. Morris, an individual who is

neither qualified nor competent to give an opinion as to why the Premises may be difficult to rent

or to give any estimates of value.  Mr. Morris holds no licenses or certifications other than his

broker's license.  Mr. Morris is not a certified appraiser and has no appraisal training beyond the

courses he took while enrolled in the University of Connecticut's real estate certification

program, and has never been qualified as an expert witness to give an opinion as to value in any

court.  See Deposition of Jay Morris at 10, 121 (attached to the defendants' Local Rule 56(a)1

Statement as Exhibit O).

When the plaintiffs purchased the Premises in September 2000, the market for real estate of quality and location equal to that of the Premises was, according to Mr. Sabella, "normally healthy." See Deposition of Thomas Sabella at 60 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit N). In contrast, by the time NGS sent the plaintiffs the Termination Notice in September 2001, the real estate market, including the market for properties such as the Premises, had become, according to Mr. Sabella, "difficult" due to the "general economic downturn in the country" and "soft" economy. Id. at 61-64.

The plaintiffs have introduced no admissible evidence to refute the Grant Appraisal, which demonstrates that the improvements redound to the benefit of the plaintiffs in that the market lease rate for the Premises and the annual market rent for the Premises in their improved condition are significantly greater than they would be if the Premises were restored to their original condition. See Grant Appraisal at 30-31 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit L).

## III.  SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56(c) provides that summary judgments "shall be rendered forthwith, if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." An issue is "genuine" only if there is sufficient evidence upon which a reasonable jury could base a finding for the non-moving party, and a fact is "material" if a dispute about it might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes

demonstrate the absence of a genuine issue of material fact.  <u>Chelates Corp. v. Citrate</u>, 477 U.S. 317, 322-3, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).  The summary judgment standard "mirrors the standard for a directed verdict . . . which is that the trial judge must direct a verdict if under the governing law there can be but one reasonable conclusion as to the verdict." <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 248.

The non-moving party must produce more than a "mere scintilla" of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings.  <u>Id</u>. at 249.  In other words, after the moving party has met its initial burden, summary judgment is appropriate only if the non-moving party fails to rebut by making an actual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Id</u>. at 250.

## IV.    ARGUMENT

As discussed above, the parties agree that the Lease contained a covenant to restore the Premises to their original condition and that the defendants did not restore the Premises to their original condition. Therefore, the only issue in dispute between the parties is the legal question of whether plaintiffs are entitled to any damages and, if so, the proper measure of damages. Because the defendants have presented undisputed evidence that the plaintiffs have not suffered any damages as a matter of law, the Court must deny the plaintiffs' motion for partial summary judgment and grant the defendants' cross-motion for summary judgment.

### A.    Proof Of Damage Is An Essential Element Of A Breach Of Contract Cause Of Action

As the Plaintiffs correctly set forth in the Memorandum of Law in support of their Motion for Partial Summary Judgment, in order to set forth a breach of contract claim under Connecticut law, the plaintiffs must establish the following four elements: (1) formation of an

agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4)

damages. See Plaintiff's Memorandum of Law at 3-4, citing Bouchard v. Sundberg, 80 Conn.

App. 180 (2003); Maloney v. Connecticut Orthopedics, P.C., 47 F. Sup.2d 244, 249 (D. Conn.

1999).

> **1.    Under Connecticut Law, The Proper Measure Of Damages Is The Diminution In The Value Of The Premises Caused By The Defendants' Failure To Restore The Premises To Their Original Condition**

As the plaintiffs concede, the Lease is governed by Connecticut law.  See Plaintiff's Rule

56(a)1 Statement at ¶21; Lease, ¶38 (attached to the defendants' Local Rule 56(a)1 Statement as

Exhibit A).  Under Connecticut law, "[t]he general rule of contract damages is that the injured

party should be placed in a position he would have been in had the contract been fully

performed." Spera v. Audiotape Corp., 1 Conn. App. 629, 633, 474 A.2d 481 (1984) (citing Loda

v. H.H. Sargeant & Associates, Inc., 188 Conn. 69, 82, 448 A.2d 812 (1982)).  In Levesque v. D

& M Builders, Inc., 170 Conn. 177, 365 A.2d 1216 (1976), however, the Connecticut Supreme

Court adopted a rule that limits damages in cases involving real property "to the diminished

value of the property whenever the cost of restorations is dramatically larger than the difference

in value." Spera, 1 Conn. App. at 633.

The purpose of this "diminution in value" rule is to avoid unreasonable economic waste.

Id.  Although the cost of restoration may sometimes be a proxy for the diminution in value, this

is only true where the cost of restoration "does not exceed the former value of the property and if

the restoration does not enhance the value of the property over what it was before the injury." Id.

(citing Blakeman v. Tobin, 177 Conn. 597, 598, 419 A.2d 336 (1979); Johnson v. Healy, 176

Conn. 97, 106, 405 A.2d 54 (1978); Richard v. A. Waldman & Sons, Inc., 155 Conn. 343, 349,

232 A.2d 307 (1967); <u>Missouri Baptist Hospital v. United States</u>, 555 F.2d 290, 295 (Ct. Cl. 1977)).

 The plaintiff bears the burden of presenting "evidence which affords a reasonable basis for measuring" his loss. <u>Spera</u>, 1 Conn. App. at 633; <u>Ferri v. Pyramid Construction Co.</u>, 186 Conn. 682, 691, 443 A.2d 478 (1982). "Although it is often impossible to prove damages with mathematical exactitude, the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." <u>Spera</u>, 1 Conn. App. at 633. Where a tenant has made extensive changes to a property, the plaintiff must present evidence of the value of the property, both with and without the tenants' changes. <u>Falco v. James Peter Associates, Inc.</u>, 165 Conn. 442, 446, 334 A.2d 475 (1973).

 <u>Spera</u> involved a lease for a building containing both light manufacturing space and office space. <u>Spera</u>, 1 Conn. App. at 630. Like the Lease in the present case, the <u>Spera</u> lease contained a restoration clause that required the lessee to "remove all of its fixtures, machinery, equipment, and additions made to [the] premises and . . . put the premises back in the same condition as they are now in, ordinary wear, tear and needed painting excepted." <u>Id</u>. at n.3. At the start of the lease period, the office space had tile floors and two separate bathrooms, and cinderblock walls separated the office area from the rest of the building. <u>Id</u>. The office space also had a drop ceiling with flush lighting fixtures. <u>Id</u>.

 Under the lease, the tenant had the right to make improvements and alterations to the property, provided that he first obtained the written consent of the landlord. <u>Id</u>. During the lease period, the tenant decided to convert the building into a cassette manufacturing plant, which required eliminating the office space (including its walls, ceilings, tile floors, and bathrooms), removing all the light fixtures in the building, and erecting a cement pad surrounded by a chain

link fence at the front of the building to support an electrical transformer that could accommodate increased electrical amperage. Id. at 630-31. Although the tenant requested permission to make the changes to the building, the landlord did not respond to the tenant's request. Id. The tenant thereafter made the changes, and the landlord instituted a summary process action when she learned of the changes the tenant had made. The tenant thereafter voluntarily abandoned the building, but did not restore it in any way. The landlord then attempted without success to sell or lease the property for sixteen months, after which time she sold it to her children for $120,000, a price that took into account the $60,000 cost of restoring the building. Id. The landlord then sued the tenant and was awarded the cost of restoring the building.

On appeal, the Court noted that, "[a]lthough the trial court found that the sale of the property took into account the cost of restoration …, it did not find that the difference in values was equal to or even approximated that figure." Id. at 634. Moreover, the appellate court found that the trial court had employed the cost of restoration rule improperly, because it did not consider the possibility of economic waste. Id. Therefore, where the cost of restoration exceeds the diminution in market value brought about by a tenant's failure to restore, diminution in the property's market value is the proper measure of damages. Any award to a landlord that exceeds the property's diminution in value not only results in economic waste, but also provides the landlord with a windfall.

The Spera court used diminution in value as the damage measure, despite the fact that the plain language of the lease required the tenant to restore the premises to their original condition at the end of the lease term. Although NGS, like the tenant in Spera, made substantial alterations to the property, including upgrading the electrical and telecommunications systems, installing air

conditioning units, constructing partition areas in the warehouse space, and installing a ramp to

make interior portions of the Premises accessible to the physically disabled, NGS made all of its

changes pursuant to its undisputed rights under paragraph 12 of the Lease.  In contrast, the tenant

in Spera made unauthorized alterations to the leased property and failed to restore the property,

in contravention of its obligations under the lease.  Yet, in spite of this, the Court ruled that

diminution in value was the appropriate damage measure because it would make the landlord

whole, but not provide her with a windfall.  Spera, 1 Conn. App. at 634.

> **2.     Courts In The Fourth, Seventh, Ninth, and Federal Circuits Also Use Diminution In Market Value As The Damage Measure Where The Cost of Restoration Exceeds The Diminution In Market Value Attributable To The Lessee's Non-Performance**

Not only does Connecticut law support using diminution of value as the measure of

damages in this case, numerous cases in other jurisdictions provide additional support for use of

this measure.  As Milton Friedman explained in his leading treatise on leases, the general rule

that the measure of damages for a tenant's failure to restore leased property to a prescribed

condition is the cost of returning the property to that condition, the cost of restoring the property

to a specified condition is "but one method of making the landlord whole."  Milton R. Friedman,

Friedman on Leases, § 18.1, p. 1209 (4th Ed. 1997).  Indeed, like Connecticut, courts in the

Fourth, Seventh, Ninth, and Federal Circuits have held that "where the facts indicate that the cost

of repairs is unrelated to the lessors' actual damages, the rule is not applied."  See, e.g., Bowes v.

Saks & Company, 397 F.2d 113, 116 (7th Cir. 1968) (citing Pennsylvania Cement Co. v. Bradley

Contracting Co., 11 F.2d 687, 688 (2d Cir. 1926) (L. Hand, J.); Associated Stations v. Cedars

Realty and Dev., 454 F.2d 184 (4th Cir. 1972); United States v. Flood Building, 157 F.Supp. 438

(N.D. Cal. 1957); Dodge Street Building Corp. v. United States, 341 F.2d 641 (Ct. Cl. 1965);

<u>Missouri Baptist Hospital v. United States</u>, 555 F.2d 290 (Ct. Cl. 1977); <u>Banisadr Bldg. Joint</u>

<u>Venture v. United States</u>, 38 Fed. Cl. 392 (Ct. Cl. 1997).

In his treatise, Friedman further cautioned:

"There are situations where [the cost of restoration damage measure] places the landlord in a better position than if the tenant had performed, thus providing him a windfall. When this is likely, the measure of damages used is one designed to ensure that the landlord will neither lose nor benefit from the tenant's breach. <u>If the cost of restoration exceeds the diminution of market value of the property, recovery will be limited to the diminution of value</u>."

<u>Friedman on Leases</u> at 1209 (emphasis added); <u>see</u> <u>also</u> 49 Am. Jur.2d <u>Landlord & Tenant</u>,

Section 888 (1995); William H. Danne, Jr., <u>Measure and Elements of Damages for Lessee's</u>

<u>Breach of Covenant as to Repairs</u>, 45 A.L.R. 5th 251, Section 2a (1997). Therefore, in addition

to the Connecticut appellate authority cited <u>supra</u>, both the persuasive authority of other circuits

and the important policy goal of preventing parties from receiving windfalls support using

diminution of value, rather than the cost of restoration, as the measure of damages for failure to

restore a property to a prescribed condition.

### a.    Seventh Circuit

In <u>Bowes</u>, the lessors brought suit against their former lessee for breach of a clause in a

lease that required the lessee to restore the premises "as near to its original condition as

practical." <u>Bowes</u>, 397 F.2d at 114. The lessors owned the St. Clair building in downtown

Chicago, which was across an alley from the building owned by the lessee, Saks & Co. <u>Id</u>. at

115. Saks leased two floors in the lessors' building, and, consistent with the expectations of the

parties at the time the leased was signed, Saks built a bridge across the alley to connect Saks'

building with the space it leased in the lessors' building. <u>Id</u>. Saks also built a staircase between

the two floors it leased from the lessors and removed numerous partitions and doors. <u>Id</u>.

Although the plain language of the lease required Saks to remove these improvements at the end

of the lease term, Saks did not remove these improvements, claiming that the lessors had suffered no damages as a consequence of its failure to restore. Id.

In finding for the lessee, the Seventh Circuit explained that in a lawsuit for a breach of a covenant to restore, the lessor is entitled only to damages actually suffered. Id. at 116. The Bowes Court, therefore, held that in an action for breach of a covenant to restore, "the lessor is entitled only to the damages that were caused to the property by the failure to restore." Id. (citing Judge Learned Hand's opinion in Pennsylvania Cement Co.). "Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's non-performance, the diminution of fair market value is the proper measure of damages." Id. at 116-17 (citing Dodge Street, 341 F.2d at 644).

In applying the diminution in market value damage measure, the Bowes Court concluded that the lessors could not recover anything because they had not suffered any damage as a result of Saks' failure to restore the premises. Id. Accordingly, "cost of repair damages would be wholly unrelated to the loss, which do not exist. The diminution of value rule yields lessors nothing because lessee's conduct did not cause diminution." Id.

### b.    Fourth Circuit

Like the Seventh Circuit, the Fourth Circuit has also adopted diminution in market value as the appropriate damage measure in cases such as the present case. In Associated Stations, the lessor, Associated Stations, leased property to Cedars, provided that Cedars, "upon termination of the lease to leave the premises in good repair, and to remove all rubbish." Associated Stations, 454 F.2d at 184. At the end of the lease term, Cedars made no effort to clear the property of the rubbish or to restore the leased premises—which Cedars had modified to suit its operations—to their former condition. Thereafter, Associated Stations sued to recover the cost

of restoring the property to its former condition.   In assessing damages, the district court applied the "cost of restoration" rule and based damages on the amount it would cost to restore the property to the condition it had been in when the property was leased to Cedars.

The Fourth Circuit reversed the trial court's ruling on damages, and, citing the rule set forth in Bowes, held that Associated Stations should recover the lesser of the cost of restoration or the diminution in market value.  The Court reasoned that the cost of restoration rule would not restore Associated Stations to the position it would have been in but for Cedars' breach, but rather would place Associated Stations in a better position, thus providing it with a windfall.

### c.    United States Court of Claims

The U.S. Court of Claims has confronted the question of which damage measure is appropriate in cases involving breaches of covenants to restore, and it has limited the recovery of plaintiffs to diminution in market value where that value is less than the cost of restoring the premises to their original condition.  For example, in Dodge Street, the U.S. government leased several floors in Dodge Street's office building under a lease that obligated the government to restore the premises to their original condition.  Dodge Street, 341 F.2d at 642-43.  In order to tailor this space to its needs, the government made extensive additions, alterations, and repairs. Id. After the government gave Dodge Street its notice of termination of the lease, Dodge Street requested that the government restore the premises in accordance with the lease. Id. The government refused to restore the premises, citing an appraisal showing that the market value of the property in its condition at the termination of the lease exceeded the value of the property if restored in accordance with the covenants of the lease. Id.

The Court denied Dodge Street any recovery, holding that a lessor is entitled only to damages to the property occasioned by the failure to restore. Id. at 644.  "[W]here the expense of

restoration exceeds the diminution in market value of the property caused by the lessee's non-performance, the diminution in fair market value is the proper measure of damages. Furthermore, if the fair market value of the property is greater in its unrestored condition than it would be if restored in accordance with the covenants of the lease contract, the lessor has sustained no damage and is entitled to recover nothing." Id.

The Dodge Street Court added that it was incumbent upon the lessor to establish by a preponderance of the evidence that the fair market value of the building in the condition in which the lessee had covenanted to restore it, was greater than its fair market value in an unrestored state at the termination of the lease, and Dodge Street had not carried this burden. Id. at 645; see also Missouri Baptist, 555 F.2d at 290 (allocating the burden of proving cost of repairs and diminution in market value to the lessor). Under Dodge Street and Missouri Baptist, the burden of proving cost of restoration and diminution in fair market value clearly rests with the plaintiffs, a burden plaintiffs have failed to meet in this case.

Similarly, in Banisadr, defendant and plaintiff's predecessor in interest entered into a lease that contained a restoration clause. Banisadr, 38 Fed. Cl. at 393. During its occupancy of the property and with the landlord's approval, the lessee made alterations and improvements to the property. Id. The lessor sued the lessee when the lessee failed to restore the property in accordance with the restoration clause. Id. at 394. Applying the diminution in market value rule, the Court found that the plaintiff had not met its burden of showing, by a preponderance of the evidence, that "the fair market value of the property in the condition which the defendant had covenanted to restore was greater than the property's fair market value in an unrestored state at the termination of the lease." Id. at 396 (citing San Nicolas v. United States, 617 F.2d 246 (Ct. Cl. 1980)). Furthermore, the Court determined that the lessee's failure to restore did not

diminish the market value of the property. Id. Therefore, the Court held that since no actual damages had been proven, the lessor was not entitled to any recovery. Id. at 397.

         **d.**     **U.S. District Court For The Northern District Of California**

In Flood Building, an eminent domain case, the Northern District of California affirmed the use of the diminution in market value rule in both eminent domain cases and in actions involving breaches of covenants to restore. Flood Building, 157 F.Supp. at 442-43. In Flood Building, the U.S. government, after filing a complaint to condemn the Flood Building in San Francisco, later made extensive improvements to the interior of the building. Id. at 439. The government and the owners of the building agreed that the government should pay reasonable rental fees, but they could not agree on the amount of liability the government incurred by reason of the alterations of the premises. Id.

The owners of Flood Building argued that the government was required to restore the building to the condition it was in when the government took the building. Id. at 439. The government countered that it could satisfy its obligation to pay "just compensation" by paying the owners the diminution in market value of the property, if any, caused by the government's alterations, and that it should only pay the costs of restoration if those costs were less than the diminution in market value. Id.

The Court found that the building had suffered no diminution in market value by reason of the taking or as a result of the changes the government made to it during its time in possession of it. Id. In such circumstances, the Court concluded, the fair market value of the building as returned to its owners was as great as it would have been had it been returned in the condition in which it was taken. Id. Therefore, the Court held, based on the diminution in value rule, that the building owner was not entitled to any recovery. Id.

In sum, courts throughout the country have applied the diminution in market value rule in circumstances analogous to those of the present case. Under this line of cases, the plaintiffs must prove, by a preponderance of evidence, that the fair market value of the property, in the condition to which NGS had covenanted to restore it, was greater than the property's fair market value in an unrestored state at the termination of the lease. As discussed in more detail below, the plaintiffs have failed to make such a showing.

### 3.    The Cases Upon Which The Plaintiffs Rely Are Factually Distinct From The Present Case

In their memorandum, the plaintiffs cite a number of Connecticut cases involving restoration clauses for the proposition that the proper measure of damages in cases involving a failure to restore is the cost of restoration. See Plaintiff's Memorandum at 10-15. Importantly, however, none of the cases cited required a tenant whose improvements had increased the value of the property to give the plaintiffs the additional windfall of the costs of restoration. Indeed, while the plaintiffs cite only unpublished Connecticut Superior Court decisions in support of their position, they attempt to distinguish Spera—the only Connecticut Appellate Court to consider the question of the appropriate damage measure for violation of a covenant to restore— by baldly asserting that the instant case "does not involve a significant risk of economic waste." See Plaintiff's Memorandum at 14-15. The plaintiffs then go on to say—again, without any support other than broad statements in Thomas Sabella's self-serving affidavit—that "the cost of the restoration of the premises to their original condition will not exceed the former value of the building." Id. Yet, in spite of their clear burden to do so under Connecticut case law, Falco, 165 Conn. at 446, the plaintiffs have presented no evidence regarding the value of their property, much less evidence refuting the defendants' uncontroverted proof that the improvements have

increased the value of the Premises. Therefore, the plaintiffs have failed to carry their burden to prove that they have suffered damages.

**B.    Because The Plaintiffs Have Not Been Damaged As A Matter Of Law, They Are Not Entitled To Any Recovery**

Although the plaintiffs claim that they have been damaged by the defendants' failure to restore the Premises to their original condition, the defendants have provided undisputed evidence that the plaintiffs are actually in a better financial position now than they would be if the Premises were restored to their original condition. Namely, the defendants' expert witness Arnold J. Grant, appraised the Premises and concluded, in a report disclosed to plaintiffs on July 2, 2003 that the annual market rent of the Premises after NGS improved them was greater than the annual market rent before the improvements, both as of the first day of the Lease (i.e., June 1, 1999) and as of June 3, 2002, the date of the inspection of the interior of the Premises by Mr. Grant's firm. Similarly, the plaintiffs have failed to establish that their alleged inability to rent the Premises and the rental income that they claim to have lost as a result of that failure were caused by the defendants' failure to restore the Premises to their original condition. Furthermore, because the plaintiffs have not been damaged and their claims are without merit, they may not recover attorney fees or other costs associated with filing and prosecuting this action. Finally, in light of NGS's early termination and payment to the plaintiffs of the one-time early termination payment in accordance with Section 13 of the Lease, the plaintiffs are entitled

to no further remedy under the Lease.[1]

### 1.   Defendants' Appraisal Indisputably Demonstrates That The Value Of The Premises With NGS's Improvements Is Greater Than The Value Of The Premises Returned To Their Original Condition

The defendants retained Arnold J. Grant Associates, Inc. ("Grant"), a Connecticut real estate appraiser, to evaluate the market lease rate applicable to the Premises as of two different dates and in two states of condition. Mr. Grant is an MAI member of the Appraisal Institute, and a State of Connecticut Certified General Appraiser.  He has given expert testimony in the Connecticut Superior Court and the United States Bankruptcy Court.  Mr. Grant estimated the market lease rates for the Premises in their original condition and in their improved condition, first as of June 1, 1999 (i.e., the first day of the Lease) and then as of Grant's inspection of the interior of the Premises on June 3, 2002.  Grant's estimates were as follows:

---

[1] Paragraph 13 of the Lease provides an exclusive remedy for damages for early termination.  Specifically, that paragraph states "[t]he Termination Notice must be accompanied by a one-time early termination payment equal to the total unamortized Landlord's allowance towards Tenant improvements.  Lease, ¶13 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A).  It is undisputed that NGS made an early termination payment to the plaintiffs on September 25, 2001.  See Letter from Thomas Sabella to William Nadeau, dated October 10, 2001 and attached to the defendants' Rule 56(a)1 Statement as Exhibit K.  Because the defendants have already fulfilled their obligation to pay damages for early termination of the Lease, the exclusive remedy for such early termination, the defendants submit that there can be no additional damages assessed against them in connection with severing their relationship with the plaintiffs.

| Date | In Original Condition | In Improved Condition |
|---|---|---|
| June 1, 1999 | 29,700 square feet of rentable space<br><br>$6.50 per square foot per year<br><br>Annual market rent: $193,050 | 28,200 square feet of rentable space<br><br>$7.50 per square foot per year<br><br>Annual market rent: $211,500<br><br>Excess of "improved condition" annual rent over original condition annual rent: $18,450 per year |
| June 3, 2002 | 29,700 square feet of rentable space<br><br>$7.00 per square foot per year<br><br>Annual market rent: $207,900 | 28,200 square feet of rentable space<br><br>$8.00 per square foot per year<br><br>Annual market rent: $225,600<br><br>Excess of "improved condition" annual rent over original condition annual rent: $17,700 |

See Grant Appraisal at 30-31 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit L). In order to estimate the annual market rent values for the Premises, Grant utilized various research materials and compared the Premises to comparable lease properties in the Rocky Hill area. Id. at 5. Grant also physically inspected the Premises, studied the neighborhood in which the Premises are located, reviewed municipal records pertaining to the Premises, such as ownership history and building permits, and analyzed the improvements that NGS made during its tenancy in the Premises. Id.

Despite ample opportunity to do so, the plaintiffs have presented no evidence that contradicts Grant's conclusion that the value of the Premises as a rental property was greater in their improved condition than in their original condition, both when measured as of June 1, 1999

and as of June 3, 2002. Indeed, the plaintiffs have provided this court with no admissible

evidence as to the value of the premises (with or without the improvements). First, Mr. Jay

Morris, the plaintiff's broker, is neither qualified nor competent to give an opinion as to the value

of the Premises or as to why it may be difficult to rent the Premises. Mr. Morris holds no

licenses or certifications other than his broker's license. See Deposition of Jay Morris at 10

(attached as Exhibit O to the defendants' Local Rule 56(a)1 Statement). In fact, Mr. Morris is

not a certified appraisal and has no appraisal training beyond the courses he took while enrolled

in the University of Connecticut's real estate certification program, and he has never been found

qualified as an expert witness to give an opinion as to value in any court. Id. at 121. Therefore,

any testimony that Mr. Morris offers regarding the value of the Premises and why it may be

difficult to rent them should be disregarded as improper. In addition, Mr. Sabella admits that he

never obtained an appraisal of the Premises from a qualified appraiser and that Mr. Morris never

performed an appraisal of the property. See Deposition of Thomas Sabella at 47 (attached as

Exhibit N to the defendants' Local Rule 56(a)1 Statement).

Moreover, it is undisputed that the plaintiffs do not even want the Premises restored to

their original condition. Instead, the plaintiffs wish to retain the benefits of many of the changes

NGS made to the property, but recover the full cost of restoring the entire property to its original

condition. Id. at 32; see also Affidavit of Thomas Sabella at ¶¶13-20 (attached as Exhibit M to

the defendants' Local Rule 56(a)1 Statement).

Indeed, the plaintiffs have yet to undertake virtually any of the restoration work that they

claim NGS and NU are required to fund. As of June 27, 2003, the date of Mr. Sabella's

deposition, among other things, the plaintiffs had not restored the three separate electric meters,

had not demolished the interior walls that NGS erected, had not removed the concrete wheelchair

ramp, and had not restored the Premises' original telecommunications equipment. <u>See</u> Deposition of Thomas Sabella at 32; 105-06 (attached as Exhibit N to the defendants' Local Rule 56(a)1 Statement); Deposition of Jay Morris at 194 (attached as Exhibit O to the defendants' Local Rule 56(a)1 Statement).

Finally, the plaintiffs' claims that they have been harmed by NGS's alleged "removal" of the mezzanine level of the Premises are misleading. NGS removed <u>stairway access</u> to a mezzanine existing on the Premises in order to bring the mezzanine into compliance with applicable building codes and other legal requirements. <u>See</u> Affidavit of James Donohue at ¶5 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit F). All work on the mezzanine was completed by June 30, 1999—approximately fifteen months before the plaintiffs' purchased the Premises in September 2000. <u>Id</u>. at ¶6. After NGS rebuilt the mezzanine floor space, it had approximately the same number of square feet as it had previously. <u>Id</u>. Therefore, the Court must reject the plaintiffs' claims that NGS's improvements to the Premises deprived them of a mezzanine level.

Because the plaintiffs have failed to provide any admissible evidence to rebut the Grant Appraisal and seek to pick and choose which improvements to keep and which to eliminate, it is undisputed that the value of the Premises was greater at all relevant times because of the improvements that NGS made to the property. Under such circumstances, awarding any damages to the plaintiffs would be a windfall, a result that courts in Connecticut and in other jurisdictions have chosen to avoid. <u>See</u>, <u>e.g.</u>, <u>Spera</u>, 1 Conn. App. at 634; <u>Bowes</u>, 397 F.2d at 115; <u>Associated Stations</u>, 454 F.2d at 184; <u>Dodge Street</u>, 341 F.2d at 644; <u>Missouri Baptist</u>, 555 F.2d at 290; <u>Banisadr</u>, 38 Fed. Cl. at 396.

**2.    The Plaintiffs Have Presented No Evidence That The Defendants' Failure To Restore The Premises Caused Them To Lose Rental Income**

Rather than refute the undisputed evidence that NGS's improvements have increased the value of the Premises, the plaintiffs ignore this central issue and instead claim that they have experienced great difficulty in finding a new tenant or tenants for the Premises. Plaintiff's Memorandum at 16 (citing testimony of the plaintiff's real estate broker, Jay Morris). As noted above, however, Mr. Morris is neither qualified nor competent to give an opinion as to why the Premises may be difficult to rent. Whether the plaintiffs have, in fact, had difficulty leasing the Premises is irrelevant to the question of damages here, because the plaintiffs have presented no evidence that the defendants' improvements to the Premises, and not other factors, such as an abundance of empty office space in the area or a soft economy, legally <u>caused</u> the plaintiffs to lose rental income. Indeed, Mr. Sabella himself acknowledged at his deposition that the economy had soured from the time he purchased the Premises in September 2000 to September 2001, when NGS sent the plaintiffs its Notice of Termination. <u>See</u> Deposition of Thomas Sabella at 60-63 (attached as Exhibit N to the defendants' Local Rule 56(a)1 Statement).

Because the plaintiffs have failed to establish a causal link between their loss of rental income and the defendants' failure to restore the Premises to their original condition, they have failed to meet their burden to show that the fair market value of the building in the condition in which the lessee had covenanted to restore it was greater than its fair market value in an unrestored state at the termination of the Lease. Because the Grant Appraisal establishes that the rental value of the Premises has increased as a result of NGS's improvements—and the plaintiffs have failed to refute this evidence—any damages awarded to them would be a windfall. The Court should, therefore, deny the plaintiffs any recovery.

**3.**     **The Plaintiffs Are Not Entitled To Recover Attorneys' Fees And Other Costs Associated With This Lawsuit**

Paragraph 45 of the Lease states that "[i]n the event it is necessary by either party to take action to enforce the terms of this Lease, the prevailing party shall be entitled to recovery any and all costs of collection of sums due under this Lease and of the enforcement of this Lease including, without limitation, reasonable attorneys' fees, broker fees, accountant fees, expert witness fees and costs of reletting the premises, whether or not litigation is commenced." <u>See</u> Lease, ¶45 (attached to the defendants' Local Rule 56(a)1 Statement as Exhibit A).  Although the plaintiffs claim that they are entitled to recover the attorneys' fees and costs they incurred in connection with bringing the present action, the Lease precludes such recovery where, as here, the claims brought are without merit and the party bringing the action does not prevail.  Instead, the defendants submit that they are entitled to recover their attorneys' fees, expert witness fees, and other costs that they have incurred in connection with defending their interests in this action.

## V.     CONCLUSION

Because there is no genuine issue of fact that the defendants' failure to restore the Premises to their original condition has actually increased the market rental value of the property and because the plaintiffs have not met their burden to prove that they have suffered damages, NGS and NU respectfully request that the Court enter an order an order denying the plaintiffs' motion for partial summary judgment on both causes of action alleged in their Complaint and granting the cross-motion for summary judgment of NGS and NU.

THE DEFENDANTS,
NORTHEAST GENERATION SERVICES COMPANY
and NORTHEAST UTILITIES


BY: _____

ANN H. RUBIN (ct04486)
Carmody & Torrance LLP
195 Church Street; 18th Floor
P.O. Box 1950
New Haven, CT 06509-1950
Phone: 203-777-5501
Facsimile: 203-784-3199
Email: arubin@carmodylaw.com

Their Attorneys

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on the above date, to:

Philip M. Halpern, Esq.
Harry J. Nicolay, Jr., Esq.
Collier, Halpern, Newberg, Nolletti & Bock, LLP
One North Lexington Avenue
White Plains, NY  10601
Phone: 914-684-6800
Facsimile: 914-684-6986
Email: phalpern@chnnb.com
Email: hnicolay@chnnb.com

Duncan Ross MacKay, Esq.
Northeast Utilities Service Company
P.O. Box 270
Hartford, CT  06141-0270
Phone: 860-665-3495
Facsimile: 860-665-5504
Email: mackadr@nu.com

*Courtesy Copy:*

Chambers,
The Hon. Holly B. Fitzsimmons
U.S. Magistrate Judge
United States District Court
District of Connecticut
915 Lafayette Boulevard
Bridgeport, CT  06604

Ann H. Rubin