UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------X
THOMAS SABELLA and KAREN SABELLA,

                  Plaintiffs,

     -against-

NORTHEAST GENERATION SERVICES
COMPANY and NORTHEAST UTILITIES,

                  Defendants.
------------------------------------X

PLAINTIFFS' LOCAL RULE 56 (a)2 STATEMENT IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR **SUMMARY JUDGMENT**

Civil Action Docket
No. 3:02 CV 2008 (SRU)

     Plaintiffs, Thomas Sabella and Karen Sabella (hereinafter referred to collectively as the "Plaintiffs" or the "Sabellas"), by and through their attorneys, Collier, Halpern, Newberg, Nolletti & Bock, LLP, provide the following statement pursuant to Local Rule 56 (a)2.

    A.    **RESPONSE TO STATEMENT OF ALLEGEDLY UNDISPUTED FACTS IN DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT**

    1.    Defendant NGS, a corporation organized and existing under the laws of the State of Connecticut, and Har-Flan Associates ("Har-Flan") entered into a written lease agreement, dated May 13, 1999 (the "Lease").

    **Response:** Admitted.

    2.    Under the Lease, NGS rented from Har-Flan space in a 29,700 square foot commercial building located at 273 Dividend Road, Rocky Hill, Connecticut (the "Premises") for a term of sixty-two months commencing on June 1, 1999 and ending on July 31, 2004.

**Response:** Admitted.

3. On or about June 1, 1999, NGS entered into possession of the Premises and initially rented 24,500 square feet of the Premises.

**Response:** Admitted.

4. On or about June 11, 1999, defendant NU, a business trust formed and existing under the laws of the Commonwealth of Massachusetts, executed a performance guaranty of NGS's obligations under the Lease.

**Response:** Admitted.

5. Paragraph 12 of the Lease permitted NGS to make alterations to the Premises with the approval of the landlord. Paragraph 12 of the Lease also contained a restoration clause, which provided in relevant part:

> "Prior to the start of any new construction, the Tenant shall provide a copy of the scope of work to the Landlord and name(s) of contractors for approval, which shall not be unreasonably withheld. All work must comply with state and local building codes and be inspected and approved by local official. At the end of the lease term the Tenant agrees to restore the Premises to original condition, if requested by Landlord."

**Response:** The Plaintiffs admit that the Defendants have accurately set forth a portion of paragraph 12 of the Lease, except for the improper insertion of the words, "copy of the", directly after the words, "Tenant shall provide a"; and the omission of the letter "s" from the word "official".

6. During its tenancy, NGS, with the permission of the landlord, made numerous improvements to the Premises.

2

**Response:** The plaintiffs deny paragraph 6 on the basis that it is conclusory and overly broad. The defendants do not submit any proof that any improvements were made, what those alleged improvements were, who made them, how much they cost or when they were made. In fact, the record is completely devoid of any complete proof that the defendants made any improvements to the subject premises at all. The plaintiffs admit that NGS made alterations to, and damaged the premises as follows: removal of the walls, doors, carpeting, electricity, and stairway of the mezzanine, which resulted in the loss of approximately 1,700 square feet of rentable office space; installation of a large concrete ramp in the middle of the premises; removal of male and female restrooms facilities in the rear unit of the premises; removal of walls and doors which divided the premises into three separate rentable units; construction of partition areas/interior walls and office cubicles in the warehouse space of the premises, which rendered portions of the warehouse space useless; consolidation of 3 separate electric meters to one meter; and installation of through wall air conditioning units in the rear warehouse space, which damaged and placed holes in the walls. *See* Affidavit of Jay L. Morris (hereinafter referred to as "Mr. Morris") dated January, 27, 2004 at ¶21.

7. Under the Lease, NGS had a right of first refusal to rent approximately 5,207 square feet of additional space that was

adjacent to the Premises.

**Response:** Admitted.

8. On or about October 19, 1999, pursuant to its right of first refusal set forth in the Lease, NGS exercised its right to lease the remaining 5,207 square feet of the Premises.

**Response:** Admitted.

9. By a warranty deed, dated September 29, 2000, Har-Flan sold the Premises to the plaintiffs Thomas Sabella and Karen Sabella (collectively, the "Sabellas").

**Response:** Admitted.

10. On September 29, 2000, Har-Flan also assigned the Lease and the Performance Guaranty to the plaintiffs.

**Response:** Admitted.

11. Many of NGS's changes to the Premises were designed to make the facility compliant with relevant municipal codes and other legal requirements regarding handicapped accessibility. For example, the ramp that NGS installed was legally required in order to give disabled employees access to the facility, and NGS's changes to the Premises' bathroom facilities included installing handicapped accessible restroom facilities, which the Premises had previously lacked. In addition, NGS's changes to the Premises' electrical, telecommunications, and air conditioning systems were upgrades to those systems. *See* Ex. E, Deposition of William Nadeau at 53, 87.

**Response:** The plaintiffs admit that Mr. Nadeau so testified at his deposition. However, Plaintiffs deny the substance of Mr. Nadeau's testimony because Mr. Nadeau has not identified any specific municipal codes and legal requirements regarding handicapped accessibility. Moreover, Mr. Nadeau is neither

4

qualified nor competent to testify in this regard, as he does not have any personal knowledge of the applicable municipal codes and other legal requirements regarding handicapped accessibility. Mr. Nadeau is the Vice President and Chief Operating Officer of NGS. He is not an attorney familiar with such codes and legal requirements.

In addition, the plaintiffs' deny the defendants' characterization of the ramp installed by NGS. Regardless of whether the ramp was legally required, NGS only installed the ramp, or was required to do so, because of their use of the entire premises as one unit. *See* Affidavit of Thomas Sabella at ¶16. The concrete ramp in the middle of the premises served a very specific purpose during NGS's occupancy of the premises because the premises consisted of three separate rentable units which were completely isolated by demising walls. *Id.* Simply put, NGS only needed the ramp, or was required to have it, because of its use of two contiguous units of the premises which had floor heights at different elevations. *Id.* The concrete ramp allowed NGS to move people and possibly equipment from one level to another. *Id.*

Finally, the plaintiffs deny the defendants description and characterization that NGS's changes to the Premises' electrical, telecommunications, and air conditioning systems were upgrades to those systems. NGS's alterations to the premises can be

5

characterized as over-improvements designed for the specific and very limited needs of NGS only. *See* Affidavit of Jay Morris at ¶22. For example, NGS significantly increased the electrical capacity/power supply of the premises in order to operate their specific and unique equipment. *Id*. This type of an alteration to the premises could only benefit a subsequent tenant, if that tenant was in the same business as the defendants, to wit: the servicing of power plants. *Id*.

12. NGS removed stairway access to a mezzanine existing on the Premises in order to bring the mezzanine into compliance with applicable building codes and other legal requirements. NGS did not remove the mezzanine from the Premises. After NGS rebuilt the mezzanine floor space, it contained approximately the same number of square feet of floor space as it had previously. *See* Ex. F, Affidavit of James Donohue at ¶¶ 5-6.

**Response:** The plaintiffs deny paragraph 12 in its entirety First, the plaintiffs deny the defendants explanation as to why NGS removed stairway access to the mezzanine because the defendants have not identified any specific building codes and legal requirements, nor provided any witnesses who are qualified and competent to testify in this regard.

Second, the defendants' characterization of NGS's alterations to the mezzanine is misleading, and directly conflicts with the information contained in the defendants' appraisal (hereinafter referred to as the "Grant Appraisal"). *See* Affidavit of Thomas

6

Sabella at ¶9. Prior to NGS's alterations to the premises, the premises contained a second floor mezzanine <u>office</u> of approximately 1,700 square feet with walls, doors, carpeting, electricity, and a stairway. *See* Affidavit of Jay Morris at ¶20. NGS removed the stairway, walls, doors, carpeting, and electricity of the mezzanine and did not replace any of these items. *See* Affidavit of Jay Morris at ¶21 and Affidavit of James Donohue at ¶5.

Mr. Donohue's statement is misleading because the floor space that he is referring to is now the ceiling of the offices below. *See* Affidavit of Thomas Sabella at ¶12. Moreover, Mr. Donohue's statement is inconsistent with information contained in the Grant Appraisal submitted by defendants. The Grant Appraisal notes a 1,500 square feet reduction (plaintiffs contend that there is a 1,700 square feet reduction) in the rentable area of the premises. Specifically, the Grant Appraisal notes that the office mezzanine was "1,500 s.f. 'before'", and "0 s.f. 'after'". *See* Grant Appraisal, p. 1 attached to Defendants' Local Rule 56(a)1 Statement at Exhibit L.

As a result of NGS's alterations to the mezzanine, the premises lost approximately 1,700 square feet of <u>rentable office space</u> on the second floor because the doors, walls, carpeting, electricity, and stairway were removed from the mezzanine and were not replaced. *See* Affidavit of Thomas Sabella at ¶14.

13. All work on the mezzanine was completed by June 30, 1999. It was thus completed prior to the plaintiffs' purchase of the Premises in September 2000.

**Response:** The plaintiffs deny paragraph 13. The plaintiffs admit that there existed 1,700 square feet of rentable office space on the mezzanine level of the premises prior to the defendants' occupancy. The defendants, during the period of their occupancy, removed the mezzanine level office space and reduced the rentable square footage which existed by 1,700 square feet. The defendants made no effort to restore the mezzanine level office space despite being requested to do so by the landlord. See Affidavit of Thomas Sabella at ¶14; and Defendants' Responses to Plaintiffs' First Set of Interrogatories at ¶5 dated March 5, 2003, annexed to Plaintiffs' Local Rule 56(a)(1) Statement as Exhibit P.

14. Pursuant to paragraph 13 of the Lease, NGS had the right to terminate the Lease at the end of thirty-eight (38) months provided it complied with certain conditions for early termination of the lease.

**Response:** Admitted.

15. On or about September 25, 2001, NGS gave the plaintiffs written notice of its intent to terminate the Lease effective July 31, 2002.

**Response:** Admitted.

16. Pursuant to paragraph 13 of the Lease, NGS made, and the plaintiffs accepted, the requisite early termination payment to the plaintiffs by remitting a check in the amount of thirty-four thousand four hundred dollars ($34,400.00), an amount that represented the unamortized landlord allowance toward tenant improvements.

**Response:** Admitted.

17. As of June 1, 1999 (i.e., the first date of the Lease), the market lease rate for the Premises in their original condition (i.e., without NGS's improvements) was $6.50 per square foot for a rentable area of 29,700 square feet. This translates to an annual market rent of $193,050.00. See Appraisal by Arnold J. Grant

8

Associates, Inc. ("Grant") at 30.

**Response:** The plaintiffs deny Paragraph 17 in its entirety upon the grounds that the appraisal is inadmissible hearsay since the defendants have failed to submit any supporting affidavit that properly authenticates the Grant Appraisal. Separately, the Grant Appraisal is totally founded upon hearsay information, and is not based upon the personal knowledge of the appraiser. The Grant Appraisal reflects that the appraiser only made one visit to the premises on June 3, 2002. The report purports to provide information on the condition of the premises on June 1, 1999, an estimate of what it would have leased for on that date, and that certain improvements were made in 1999 and 2000. The appraiser, having only visited the premises three years later on June 3, 2002, is simply unable to have any personal knowledge of the condition of the premises, and what improvements were made prior to his personal inspection. It is impossible for the appraiser to testify as to the condition of the premises in 1999 and what improvements were made in 1999 and 2000, as he was not familiar with the building until he inspected it years later in 2002. In the absence of this personal knowledge, the appraiser's comparisons of the estimated rent in its prior condition, of which he has no knowledge, and its present condition, is unreliable hearsay. The appraisal should also not be considered on this motion upon the grounds that it was produced after the time permitted by the Scheduling Order. *See*

Affidavit of Harry J. Nicolay, Jr., dated January 28, 2004.

The plaintiffs refer the Court to the Affidavit of Thomas Sabella, the owner of the premises, which provides a detailed explanation as to the premises' diminution in value as a result of the defendants' failure to restore the premises to the original condition as requested by the landlord. Moreover, the Grant Appraisal does not demonstrate that NGS's "improvements" redound to the benefit of the plaintiffs for several reasons.

The Grant Appraisal does not take into account the market value of the premises, but only the <u>estimated market lease rate</u> of the premises at two effective dates. *See* Affidavit of Thomas Sabella at ¶34. In particular, the appraisal does not set forth any specific market value of the premises at any particular date in its restored and unrestored condition. *Id.* Second, the Grant Appraisal completely ignores the actual fact that the premises were not able to be rented at all for a period of eleven months, beginning August 1, 2002 through June 30, 2003. *Id.* Third, the estimates of market lease rates contained in the Grant Appraisal are inaccurate and do not reflect what a portion of the premises actually rented for following NGS's refusal to restore the premises to the original condition. *Id.* For example, the Grant Appraisal estimates that as of June 3, 2002, the market lease rate for the premises with NGS's "improvements" was <u>$8.00</u> per square foot. *See* Grant Appraisal, p. 1 attached to Defendants' Local Rule 56(a)1

10

Statement at Exhibit L. However, as of July 1, 2003, only 1/4 of the premises were actually rented to a new tenant at $7.00 per square foot for the first three years, and $7.50 per square foot for the next two years, which are both less than the estimate of $8.00 per square foot referenced in the Grant Appraisal. *See* Affidavit of Thomas Sabella at ¶34. Finally, the defendants' appraisal does not demonstrate the diminished value of the premises as a result of the following: (i) NGS's removal of male and female restroom facilities in the premises; (ii) the loss of 1,700 square feet of rentable office space in the mezzanine following NGS's alterations to the mezzanine; (iii) NGS's installation of a concrete ramp in the middle of the premises; and (iv) the reduction of warehouse space within the premises as a result of NGS's alterations. *Id.*

18. As of June 1, 1999 (*i.e.*, the first date of the Lease), the market lease rate for the Premises in their improved condition (*i.e.*, with NGS's improvements) was $7.50 per square foot for a rentable area of 28,200 square feet. This translates to an annual market rent of $211,500.00, or $18,450.00 more than the annual market rent for the Premises in their original condition as of the same date. *See* Ex. L, Grant Appraisal at 30.

**Response:** Plaintiffs repeat their response to paragraph 17 above.

19. As of June 3, 2002 (*i.e.*, the date of Grant's inspection of the interior of the Premises), the market lease rate for the Premises if restored to their original condition (*i.e.*, before NGS's improvements) would have been $7.00 per square foot for 29,700 square feet of rentable space. This translates to an annual market rent of $207,900.00 for the Premises in their original condition. *See* Ex. L, Grant Appraisal at 31.

**Response:** Plaintiffs repeat their response to paragraph 17 above.

20. As of June 3, 2002 (*i.e.*, the date of Grant's inspection of the interior of the Premises), the market lease rate for the Premises in their improved condition (*i.e.*, with NGS's improvements) would have been $8.00 per square foot for 28,200 square feet of rentable space. This translates to an annual market rent of $225,600.00, or $17,700.00 more than the market rent for the Premises in their original condition as of the same date. *See* Ex. L, Grant Appraisal at 31.

**Response:** Plaintiffs repeat their response to paragraph 17 above.

21. The plaintiffs do not wish to restore the Premises to their original condition; instead, they seek to restore only "portions" of the Premises to their original condition in order to retain the benefit of NGS's improvements to the property. At the same time, the plaintiffs seek to recover the full cost of restoring the Premises to their original condition.

**Response:** The plaintiffs deny Paragraph 21 in its entirety upon the grounds that it is conclusory and contrary to the Lease terms. The defendants have not established or provided any proof that they have improved the premises, what the alleged improvements are, when they were made, who made them, what they cost and what their value is. The subject Lease mandates that the defendants restore the items requested by the landlord, and that the cost to restore the requested items is the proper measure of damages under the liquidated damages clause of the Lease. *See* paragraph 12 and

12

25(B)(3) of the Lease, at Exhibit D to Plaintiffs' Local Rule 56(a)1 Statement.

    22. The plaintiffs never sought to have the Premises appraised and they did not ask their broker, Mr. Morris, to perform an appraisal of the Premises. *See* Ex. N, Deposition of Thomas Sabella at 47-48.

**Response:** The plaintiffs deny Paragraph 22, upon the grounds that it is conclusory and inaccurate. The owner of the premises is competent to testify as to its value and they diminution of value caused by the acts of the defendants. *See* Plaintiffs' Memorandum of Law in further support of motion for partial summary judgment and in opposition to defendants' cross-motion, and the Affidavit of Thomas Sabella at ¶21-31, demonstrating the diminished value of the premises. The liquidated damages clause of the Lease at Paragraph 25(B)(3) also provides that the proper measure of damages is the cost of performing any other covenants to be performed by tenant. *See* Exhibit D to Plaintiffs' Local Rule 56(a)1 Statement.

    23. The plaintiffs have yet to undertake virtually any of the restoration work that they claim NGS and NU are required to fund. As of Thomas Sabella's deposition on June 27, 2003, among other things, the plaintiffs had not restored the three separate electric meters, had not demolished the interior walls that NGS erected, had not removed the large, concrete wheelchair ramp, and had not restored the Premises' original telecommunications equipment. *See* Ex. N, Deposition of Thomas Sabella at 105-06. *See also* Deposition of Jay L. Morris at 194.

**Response:** The plaintiffs' deny the defendants' statement that

13

the plaintiffs have yet to undertake virtually any of the restoration work that they claim NGS and NU are required to fund. To date, plaintiffs' have spent $74,655.36 in order to renovate the premises for a new tenant. *See* copies of checks payable to Delta Building Corporation (hereinafter referred to as "Delta") annexed to the Affidavit of Thomas Sabella, at Exhibit A. *See also* Exhibit B annexed to the Affidavit of Gary R. Dayharsh, dated January 19, 2004, for additional documents that reflect performance and payment of some of the restoration work performed on the premises by Delta. Part of this cost, included restoration work that the plaintiffs requested the defendants to restore, including installation of two new restroom facilities, new doors to the premises, installation of separate gas meters, and miscellaneous heating, ventilation, and air conditioning modifications.

24. There is no admissible evidence in the record before the Court that the improvements NGS made to the Premises caused plaintiffs any loss of rental income. The testimony of plaintiffs' broker, Mr. Morris, an individual who is neither qualified nor competent to give an opinion as to why the Premises may be difficult to rent or to give any estimates of value, must be disregarded by this Court. Mr. Morris holds no licenses or certifications other than his broker's license. Mr. Morris is not a certified appraiser and has no appraisal training beyond the courses he took while enrolled in the University of Connecticut's real estate certification program, and he has never been qualified as an expert witness to give an opinion as to value in any court.

**Response:** The plaintiffs deny Paragraph 24 in its entirety. The defendants have not established or provided any proof that they

14

have improved the premises, what the alleged improvements are, when they were made, who made them, what they cost and what their value is. The subject Lease mandates that the defendants restore the items requested by the landlord, and that the cost to restore the requested items is the proper measure of damages under the liquidated damages clause of the Lease. *See* paragraph 12 and 25(B)(3) of the Lease, at Exhibit D to Plaintiffs' Local Rule 56(a)1 Statement. Mr. Morris is a licensed real estate broker at Owens, Renz & Lee Co., Inc. (a/k/a., "O, R & L Realtors") and the Managing Director of O,R&L's Hartford County Commercial Real Estate office. *See* Affidavit of Jay Morris at ¶¶ 2,3,4. Mr. Morris has extensive experience with leasing and selling commercial real estate and warehouse properties. *Id*. at ¶¶ 5,6,7,13. He also has extensive experience and knowledge of lease rates and values of buildings in the Rocky Hill, Connecticut area. *Id*. at 13. In December 2001, Mr. Morris was hired by the plaintiffs as the real estate agent to lease the premises to new tenants following the termination of NGS's Lease. *Id*. at 17. Accordingly, Mr. Morris is more than qualified to give an opinion as to why the premises have not been fully rented, and in view of his experience and background in commercial real estate.

    25. When the plaintiffs purchased the Premises in September 2000, the market for real estate of quality and location equal to that of the Premises was, according to Mr. Sabella, "normally healthy." *See* Ex. N, Deposition of Thomas Sabella at 60.

Case 3:02-cv-02008-SRU   Document 47   Filed 01/29/2004   Page 16 of 19

**Response:** Plaintiffs admit that Thomas Sabella so testified as alleged in paragraph 25, but denies the context in which the plaintiff is attempting to use the testimony and its relevance.

26.  When NGS sent the plaintiffs the Termination Notice in September 2001, the real estate market, including the market for properties such as the Premises, had become "difficult" due to the "general economic downturn in the country" and "soft" economy. *See* Ex. N, Deposition of Thomas Sabella at 61-64.

**Response:** Plaintiffs admit that Thomas Sabella so testified as alleged in paragraph 26, but denies the context in which the plaintiff is attempting to use the testimony and its relevance. The defendants offer no proof to establish that the purportedly soft economy had or has any effect on the inability to rent the subject premises. To the contrary, the plaintiffs have offered credible evidence to establish that the inability to rent the premises was directly attributable to the damages and alterations performed by the defendants, together with the failure to restore the premises as requested by the landlord. *See* Affidavit of Jay Morris at ¶24 and 25.

27.  The plaintiffs have introduced no admissible evidence to refute defendants' expert testimony as to the value of the Premises (the Grant Appraisal), which demonstrates the improvements redound to the benefit of the plaintiffs in that the market lease rate for the Premises and the annual market rent for the Premises in their improved condition are greater than they would be if the Premises were restored to their original condition.

**Response:**  The plaintiffs deny Paragraph 27 in its entirety.

16

The plaintiffs repeat their responses to paragraphs 17 and 21 above. In addition, the plaintiffs refer the Court to the Affidavit of Thomas Sabella, the owner of the premises, which provides a detail explanation as to the premises' diminution in value as a result of the defendants' failure to restore the premises to the original condition as requested by the landlord.

   28.   Paragraph 38 of the Lease states that the Lease "shall be construed under the laws of the State of Connecticut."

   **Response:**   Admitted.


   B.   **MATERIAL FACTS AS TO WHICH PLAINTIFFS CONTEND THERE ARE GENUINE ISSUES TO BE TRIED**

As explained in detail in the plaintiffs' Memorandum of Law in further support of plaintiffs' motion for partial summary judgment and in opposition to the defendants' cross-motion for summary judgment, the plaintiffs submit that there are no material facts as to which there are genuine issues to be tried. The only disputed issue before the Court is a legal question regarding the appropriate measure of damages.

Dated:   White Plains, New York
         January 29, 2004

                        COLLIER, HALPERN, NEWBERG,
                        NOLLETTI & BOCK, LLP
                        Attorneys for Plaintiffs

By:   _____
      Harry J. Nicolay, Jr. (CT24875)
      A Member of the Firm
      One North Lexington Avenue
      White Plains, NY 10601
      Telephone: (914) 684-6800
      Facsimile: (914) 684-6986

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiffs' Local Rule 56(a) 2 Statement in Opposition to Defendants' Cross-Motion For Summary Judgment have been served upon the following counsel of record by first class mail, postage prepaid this 29th day of January, 2004.

To: Ann H. Rubin, Esq.
Carmody & Torrance LLP
195 Church Street, 18th Floor
P.O. Box 1950
New Haven, Connecticut 06509-1950

Duncan R. MacKay, Esq.
Northeast Utilities Service Company
P.O. Box 270
Hartford, Connecticut 06141-0270

*Courtesy Copy*:
Chambers,
The Hon. Holly B. Fitzsimmons
United States Magistrate Judge
United States District Court
District of Connecticut
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

Chambers,
Honorable Stefan R. Underhill
U.S. District Judge
U.S. District Court, District of Connecticut
915 Lafayette Boulevard, 4th Floor
Bridgeport, Connecticut 06604

_____
Harry J. Nicolay, Jr. (CT24875)